WEST AMERICAN INSURANCE CO. v. TUFCO FLOORING EAST

[104 N.C. App. 312 (1991)]

WEST AMERICAN INSURANCE CO., PLAINTIFF v. TUFCO FLOORING EAST,
INC., TUFCO FLOORING SALES & SERVICE, INC., AND PERDUE FARMS,
INC., DEFENDANTS

No. 9018SC1052

(Filed 5 November 1991)

1. **Insurance § 149 (NCI3d) — commercial general liability policy — pollution exclusion — floor resurfacing — chicken contaminated by fumes**

   The trial court did not err by ruling that a pollution exclusion clause in a commercial general liability policy did not exclude coverage for chicken products contaminated by fumes or vapors from floor resurfacing work. The products completed operations hazard coverage of the policy, which includes all property damage occurring away from premises the insured owns or rents and arising out of the insured's work so long as the work is completed before the property damage occurs, applies to defendant Perdue's claim against defendant Tufco. The work was done away from any premises rented or owned by Tufco, it is undisputed that the property damage suffered by Perdue arose from Tufco's work, and the damage to the chicken was not discovered until after Tufco completed its work. The date of discovery rationale of *Mraz v. Canadian Universal Ins. Co.*, 804 F.2d 1324, is expressly adopted as the rule in North Carolina and, for insurance purposes, property damage occurs when it is first manifested or discovered.

   **Am Jur 2d, Insurance §§ 717, 719.**

2. **Insurance § 149 (NCI3d) — commercial general liability policy — pollution exclusion clause — overriding completed operations coverage**

   Completed operations insurance coverage purchased by defendant Tufco from plaintiff West American overrode the pollution exclusion clause in the policy where the override was reflected in the pollution exclusion clause itself and in a flyer sent with the policy, the insurance industry association which drafted the exclusionary clause has explained in annotations to the clause that it is overridden by completed operations coverage, and the International Risk Management Institute describes an exception for pollution liability falling within the products-completed operations hazard. Moreover,

WEST AMERICAN INSURANCE CO. v. TUFCO FLOORING EAST

[104 N.C. App. 312 (1991)]

the policy in this case is ambiguous and must be construed against the drafter/insurer. A reasonable person in the position of Tufco would have understood this claim to be covered.

**Am Jur 2d, Insurance §§ 284, 286, 717, 719.**

3. **Insurance § 149 (NCI3d) — commercial general liability insurance — pollution exclusion clause — food contaminated by flooring vapors**

The trial court correctly ruled that a pollution exclusion clause to a commercial general liability policy did not apply to a claim for chicken contaminated by vapors from a flooring compound where the flooring material was not a pollutant under the exclusion clause. It was not an irritant or a contaminant when it was brought into the plant.

**Am Jur 2d, Insurance §§ 717, 719.**

4. **Insurance § 149 (NCI3d) — commercial general liability insurance — pollution exclusion clause — coverage not denied**

A pollution exclusion clause in a commercial general liability insurance policy did not exclude coverage to Tufco for Perdue's claims where Tufco installed a coating over existing floors in a Perdue facility and chicken stored in the facility was contaminated by vapors from the flooring compound. Both the historical purpose underlying the pollution exclusion and the operative policy terms indicate that a discharge into the environment is necessary for the clause to be applicable. The policy contains a pollution exclusion, not an exclusion for all damages that may result due to Tufco's use of chemicals in the installation of industrial flooring.

**Am Jur 2d, Insurance §§ 717, 719.**

APPEAL by plaintiff from judgment entered 28 July 1990 in GUILFORD County Superior Court by *Judge W. Steve Allen.* Heard in the Court of Appeals 16 April 1991.

*William L. Stocks and Douglas E. Wright for plaintiff-appellant.*

*Tuggle, Duggins & Meschan, by Robert C. Cone, for defendant-appellee, Tufco.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, by George W. House and James A. Wilson, for defendant-appellee, Perdue Farms.*

WEST AMERICAN INSURANCE CO. v. TUFCO FLOORING EAST

[104 N.C. App. 312 (1991)]

WYNN, Judge.

Plaintiff, West American Insurance Co. ("West American"), seeks to overturn the summary judgment granted to defendants, Tufco Flooring East, Inc., Tufco Flooring Sales & Service, Inc. ("Tufco"), and Perdue Farms, Inc. ("Perdue"). We affirm the decision of the trial judge to grant the summary judgment in favor of the defendants Tufco and Perdue.

The facts in this case are undisputed. Tufco is in the floor resurfacing business which includes installation of a coating over existing floors. The coating used consists of a six-layer system using several chemicals, three of which contain a chemical compound known as styrene. From 25 March through 27 March 1989, employees and agents of Tufco performed floor resurfacing work in certain areas of the Perdue chicken processing facility in Accomac, Virginia. While the work was being done, chicken products were being stored by Perdue in a location known as the "twenty-eight degree cooler" which was adjacent to one of the areas being resurfaced.

On 28 March 1989, the day after Tufco completed its work, Perdue shipped the chicken which had been in the twenty-eight degree cooler to various customers. On 29 March 1989, these customers notified Perdue that there was a problem with the smell and taste of the chicken. Subsequent chemical testing revealed that the chicken contained styrene and was unfit for human consumption. After disposing of approximately $500,000 in chicken parts, Perdue asserted a claim against Tufco. Perdue alleged that the chicken was damaged while in the twenty-eight degree cooler as a result of coming into contact with styrene vapors or fumes released from the chemicals used by Tufco during the resurfacing work.

In March of 1989, Tufco had in force a commercial liability policy through West American which contained a "pollution exclusion" clause. Based upon that exclusion, West American took the position that no insurance coverage was provided for any claims by Perdue against Tufco resulting from the infiltration of chicken by styrene fumes which were released by the products Tufco used in its operations.

**WEST AMERICAN INSURANCE CO. v. TUFCO FLOORING EAST**

[104 N.C. App. 312 (1991)]

Subsequently, West American filed a declaratory judgment action seeking a declaration that Tufco's insurance policy provided no liability coverage for Perdue's claim against Tufco. Both Perdue and Tufco filed counterclaims asking for a declaratory judgment in their favor. Perdue also had a cross-claim against Tufco for damages alleging that Tufco was negligent, but that action has been severed from the claims for declaratory relief. Based upon information produced at discovery, all parties filed motions for summary judgment.

Following a hearing, the trial judge entered judgment denying West American's motion for summary judgment and granting summary judgment to Tufco and Perdue. The judge found that the pollution exclusion in the policy did not exclude coverage for the claims of Perdue against Tufco and that Tufco had liability coverage under the West American policy. Further, pursuant to N.C.R. Civ. P. 54, the trial judge entered final judgment as to all parties and all claims for declaratory relief concerning insurance coverage. From that judgment, West American has appealed.

## DISCUSSION

The central controversy in this case is whether the trial court erred in ruling that the "pollution exclusion" clause in the West American policy covers Perdue's claims against Tufco. The "pollution exclusion" clause in controversy is contained in section I.2.f. of the commercial general liability (CGL) insurance policy that Tufco purchased from West American. When Perdue asserted its claim in March 1989, Tufco had in force this CGL insurance policy through West American. The West American policy contained the following exclusion pertaining to pollutants:

2. Exclusions

This insurance does not apply to:

. . . .

    f. (1) "Bodily injury" or "property damage" arising out of the actual, alleged, or threatened discharge, dispersal, release or escape of pollutants:

        (a) At or from premises you own, rent or occupy;

        (b) At or from any site or location used by or for you or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for you or any person or organization for whom you may be legally responsible; or

(d) At or from any site or location on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations:

(i) if the pollutants are brought on or to the site or location in connection with such operations; or

(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants.

(2) Any loss, cost, or expense arising out of any governmental direction or request that you test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Based upon this "pollution exclusion" clause, West American takes the position that no insurance coverage is provided for any claims by Perdue against Tufco resulting from the infiltration of chicken products in the twenty-eight degree cooler by styrene fumes or vapors which were released by the products that Tufco used in resurfacing the floor at the Perdue plant from 25 March through 27 March 1989. We disagree. The trial court's ruling that the "pollution exclusion" clause does not apply to the claim at issue is supported by four independent grounds: (1) the "pollution exclusion" clause is expressly inapplicable to and overridden by the "completed operations" coverage in the policy, which applies to the claim at issue; (2) the West American insurance policy applied to this claim is ambiguous, and that ambiguity must be construed against the drafter/insurer; (3) as brought onto the site, the flooring material, styrene monomer resin, was not a "pollutant" under the "pollution exclusion" clause; and (4) the "pollution exclusion" clause applies only to discharges into the environment, and none occurred here.

WEST AMERICAN INSURANCE CO. v. TUFCO FLOORING EAST

[104 N.C. App. 312 (1991)]

## I.

[1]  The trial court did not err in ruling that the "pollution exclusion" clause in the West American policy does not exclude coverage for the claims of Perdue against Tufco. The "pollution exclusion" clause is expressly inapplicable to and overridden by the "completed operations" coverage in the policy, which applies to the claim at issue.

Section V..11.a. of the West American policy defines the "products-completed operations hazard." This completed operations coverage is a common form of additional coverage available to purchasers of liability insurance, and it was purchased by Tufco in this case. As pertinent here, the scope of the completed operations coverage includes all property damage occurring away from premises the insured owns or rents and arising out of the insured's work, so long as the work is completed before the property damage has occurred.

The "products-completed operations hazard" applies to Perdue's claim against Tufco. The work was done by Tufco at Perdue's plant in Accomac, Virginia, away from any premises rented or owned by Tufco. Also, it is undisputed that the property damage suffered by Perdue arose out of Tufco's work. Nevertheless, West American claims that the "products-completed operations hazard" does not extend coverage to Tufco for Perdue's claims because the property damage in question "occurred," for insurance purposes, before the completion of Tufco's work. This argument has no merit. The damage to the chicken was not discovered until 29 March 1989 — two days after Tufco completed its work — when customers notified Perdue that there was a problem with the smell and taste of the chicken. Despite the fact that neither this Court nor the North Carolina Supreme Court has had occasion to rule on the issue, the "general" rule is that, for insurance purposes, property damage "occurs" when it is manifested or discovered. *Mraz v. Canadian Universal Ins. Co.*, 804 F.2d 1325, 1328 (4th Cir. 1986). This rule is also the majority rule in the United States. *See Community Fed. Sav. & Loan Ass'n v. Hartford Steam Boiler Inspection & Ins. Co.*, 580 F. Supp. 1170 (E.D. Mo. 1984); *Aetna Casualty & Surety Co. v. PPG Industries, Inc.*, 554 F. Supp. 290, 294 (D. Ariz. 1983) (property damage occurred when defective insulation was discovered); *Travelers Ins. Co. v. C.J. Gayfer's & Co.*, 366 So.2d 1199, 1202 (Fla. App. 1979) (property damage occurs

when "negligence manifests itself in property damage"). The *Mraz* "date of discovery" rule also has been specifically adopted by the U.S. District Court for the Eastern District of North Carolina, applying North Carolina law. *See Peerless Ins. Co. v. Strother*, 765 F. Supp. 866, 870 (E.D.N.C. 1990) (applying "the 'discovery' trigger of coverage theory" in hazardous waste coverage case).

The Fourth Circuit's decision in *Mraz* is highly relevant to the instant case. At issue was a determination of insurance coverage for the costs of cleaning up buried hazardous waste. The Fourth Circuit held that the "occurrence" is judged by "*the time at which the leakage and damage are first discovered.*" 804 F.2d at 1328 (emphasis added). West American argues that *Mraz* is limited to the unique facts of hazardous waste cases. This interpretation of the case is unduly restrictive. The *Mraz* definition of "occurrence" as a provision in a liability insurance policy is not meant to be confined in application strictly to hazardous waste cases. The following excerpt from *Mraz* is indicative of this point:

> There are situations . . . in which the existence or scope of damage remains concealed or uncertain for a period of time even though [the] damage is occurring. The leakage of hazardous wastes as in this case is a clear *example*. Determining exactly when damage begins can be difficult, if not impossible. In such cases we believe that the better rule is that the occurrence is deemed to take place when the injuries first manifest themselves.

*Id.* (emphasis added). The court merely used the "example" of a hazardous waste case to illustrate the "date of discovery" rule because *Mraz* involved hazardous waste. It never once stated that the "date of discovery" rule should be applied to determine insurance coverage liability *only* in a hazardous waste case.

We therefore find that the *Mraz* date of discovery "trigger" of CGL coverage was applied correctly in this case. The trial court correctly determined that the damage suffered by Perdue "occurred" on 29 March 1989—the date that customers notified Perdue that there was a problem with the smell and taste of the chicken. Furthermore, we now expressly adopt the *Mraz* "date of discovery" rationale as the rule in North Carolina, and we hold that for insurance purposes property damage "occurs" when it is first manifested or discovered.

The elements of the completed operations coverage are thus present in this case. The damage occurred away from Tufco's (the insured's) premises and arose out of its work for Perdue, and Tufco's work was completed on 27 March 1989—two days before the damage "occurred" on 29 March 1989.

[2]   Having determined that, we now must decide if the completed operations coverage overrides the pollution exclusion clause relied on by West American. We hold that the completed operations coverage purchased by Tufco from West American does indeed override the pollution exclusion clause in the CGL policy. This "override" is reflected in four different documents presented to the trial court and included in the record on appeal.

First, the pollution exclusion clause applies only to claims arising from work in progress, not completed operations. Specifically, it excludes claims "arising out of the . . . discharge, dispersal, release or escape of pollutants . . . at or from any site or location on which you [the insured] . . . are performing operations."

Second, in a flyer sent to Tufco with the policy, West American itself expressed its intention not to subject the completed operations coverage to the pollution exclusion clause. Specifically, section II of the flyer, entitled "Broadening of Coverage," states with regard to "pollution liability coverage" that the policy provides "[c]overage with respect to . . . [n]on-sudden or gradual emissions of pollutants . . . *[d]ue to the products-completed operations hazard . . . .*" (emphasis added).

Third, as reflected in a document submitted to the trial court and made part of the record on appeal, the insurance industry association that drafted the pollution exclusion clause at issue, namely the Insurance Services Office ("ISO") of America, has explained in annotations to the pollution exclusion clause that it is overridden by completed operations coverage. The annotations compare a prior version of the general liability policy with the version issued by West American to Tufco. The annotations point out that, whereas the prior pollution exclusion clause contained "[n]o products-completed operations hazard," the current version results in "coverage [that] embraces products-completed operations exposure from both sudden and gradual emissions."

Fourth, in another document submitted to the trial court and made part of the record on appeal, the International Risk Manage-

ment Institute, which researches and analyzes commercial liability provisions for the insurance industry and others, describes the interrelationship of the pollution exclusion clause and the completed operations coverage as follows:

> An exception for pollution liability falling within the products-completed operations hazard is inferred by the exclusion, and ISO has stated that the exception is intended. This exception does have important coverage consequences. *If a pollution release causing bodily injury or property damage results from the insured's product or completed operation, the insured's liability to injured parties is covered.*

Gibson & McLendon, *Commercial Liability Insurance*, Volume I, Section V, V.E.1 (1985) (emphasis added).

## II.

The second reason that the trial court did not err in ruling that the "pollution exclusion" clause does not exclude coverage is because the West American CGL policy applied to this claim is ambiguous. Under North Carolina law, that ambiguity must be construed against the drafter/insurer, West American.

Ambiguities in insurance policies are to be strictly construed against the drafter, the insurance company, and in favor of the insured and coverage since the insurance company prepared the policy and chose the language. *Grant v. Emmco Ins. Co.*, 295 N.C. 39, 43, 243 S.E.2d 894, 897 (1978); *Southeast Airmotive Corp. v. United States Fire Ins. Co.*, 78 N.C. App. 418, 420, 337 S.E.2d 167, 169 (1985), *disc. review denied*, 316 N.C. 196, 341 S.E.2d 583 (1986). An ambiguity arises in an insurance policy when the language used in the policy is susceptible to different and conflicting interpretations. In this case, the policy must be given the interpretation most favorable to the insured. *W & J Rives, Inc. v. Kemper Ins. Group*, 92 N.C. App. 313, 316, 374 S.E.2d 430, 433 (1988), *disc. review denied*, 324 N.C. 342, 378 S.E.2d 809 (1989). This rule is particularly appropriate when considering exclusions from coverage, which are not favored by the courts and are to be strictly construed against the insurer. *Id.* at 317, 374 S.E.2d at 433. "When the coverage provisions of a policy include a particular activity, but that activity is later excluded, the policy is ambiguous, and the apparent conflict between coverage and exclusion must be resolved in favor of the insured." *Southeast Airmotive Corp.*, 78 N.C. App. at 420, 337

WEST AMERICAN INSURANCE CO. v. TUFCO FLOORING EAST

[104 N.C. App. 312 (1991)]

S.E.2d at 169. Conversely, "policy provisions which extend coverage are construed liberally in favor of coverage." *C.D. Spangler Constr. Co. v. Industrial Crankshaft & Eng'g Co.*, 326 N.C. 133, 142, 388 S.E.2d 557, 563 (1990). Applying these well-settled principles governing the construction of insurance policies, any ambiguity in the interrelationship between the completed operations coverage and the pollution exclusion clause must be resolved in favor of Tufco.

Furthermore, when an ambiguity exists, an insurance policy should be construed as a reasonable person in the position of the insured would have understood it to mean. *Grant*, 295 N.C. at 43, 243 S.E.2d at 897; *W & J Rives, Inc.*, 92 N.C. App. at 316, 374 S.E.2d at 433. A reasonable person in the position of Tufco would have understood claims such as Perdue's to be covered. Tufco is in the business of installing industrial flooring, and Tufco purchased a commercial liability policy to protect it from liabilities arising from the very type of activity at issue here. This work was no secret. As early as February 1988, West American was aware of the type of business activity in which Tufco was engaged. Yet, in West American's answer to an interrogatory from Perdue, West American does not deny that it never told Tufco of its interpretation that the CGL policy did not cover damages arising from Tufco's regular business activities. West American's interpretation of the CGL policy purchased by Tufco is erroneous. To allow West American to deny coverage for claims arising out of Tufco's central business activity would render the policy virtually useless to Tufco. If this Court accepted West American's interpretation of the CGL policy, we would be allowing an insurance company to accept premiums for a commercial liability policy and then to hide behind ambiguities in the policy and deny coverage for good faith claims that arise during the course of the insured's normal business activity. Such an interpretation would constitute the height of unfairness. *See Bentz v. Mutual Fire, Marine & Inland Ins. Co.*, 83 Md. App. 524, 575 A.2d 795 (1990) (where the insured's "sole business" was pesticide application and insurer was aware of the nature of the business, the court agreed that the parties intended the insurance policy to cover the insured's "normal operations").

III.

[3] The third reason the trial court's ruling is correct is because as brought onto the site, the flooring material, styrene monomer resin, was not a "pollutant" under the "pollution exclusion" clause.

WEST AMERICAN INSURANCE CO. v. TUFCO FLOORING EAST

[104 N.C. App. 312 (1991)]

West American argues that the pollution exclusion clause is applicable because the styrene vapors emanating from the flooring material (styrene monomer resin) used by Tufco constituted a "pollutant" which Tufco brought on or to the site. We disagree. Tufco did not bring the *vapors* or *fumes* which invaded the chicken to the Perdue plant. Rather, Tufco brought an unadulterated, pure raw material, styrene monomer resin, in one-gallon metal cans with screw-on caps. When this raw material was brought onto the site, it was neither an "irritant or contaminant." It was a raw material used by Tufco in its normal business activity of resurfacing floors. Yet, to be a "pollutant" under the exclusion, a substance brought onto the site must be precisely that, an "irritant or contaminant."

Paragraph (d)(i) of the "pollution exclusion" clause is the operative provision which West American argues denies coverage to Tufco for Perdue's claims. However, paragraph (d)(i) must be read in conjunction with the paragraphs surrounding it, specifically (b), (c), and (d)(ii). All of these paragraphs refer to the management and/or treatment of an unwanted waste material. Similarly, paragraph (d)(i) relates to the use of some form of unwanted or waste material upon the site. It was not meant to refer to any raw material brought upon the premises by the insured for the purpose of normal business activity which accidentally resulted in property damage or bodily injury.

The Oxford English Dictionary (2d Edition, 1989) defines "pollutant" as "a polluting agent or medium." It also defines "pollute" as "2. a. [t]o make physically impure, foul, or filthy; to dirty, stain, taint, befoul. *spec.* To contaminate (the environment, atmosphere, etc.) with harmful or objectionable substances." This common understanding of the word "pollute" indicates that it is something creating impurity, something objectionable and unwanted. The flooring material (styrene monomer resin) brought upon the premises by Tufco was wanted. It was not impure. When Tufco purchased its CGL insurance, it understood "pollutant" in the same way that the Oxford English Dictionary defines "pollutant," *as an unwanted impurity, not as the raw materials which Tufco purchased to do its job.*

In *A-1 Sandblasting & Steamcleaning Co. v. Baiden*, 53 Or. App. 890, 632 P.2d 1377 (1981), *aff'd*, 293 Or. 17, 643 P.2d 1260 (1982), the insurance company contended that paint which damaged passing cars as a result of paint overspray during bridge repairs

was a "pollutant." The Oregon Court of Appeals disagreed and stated:

> The specifics mentioned in the policy exclusion are generally considered to be irritants, contaminants or pollutants, whereas "paint" in common understanding is not generally so thought of.
>
> . . . .
>
> While it may be technically true that paint could fall within these classes, we do not believe that that meaning is so clear as to cause a reasonable person in the position of the insured to believe that paint was one of the substances referred to in [the pollution] exclusion . . . .

*Id.* at 894, 632 P.2d at 1379. Similarly, the styrene monomer resin at issue here was not an irritant or contaminant when brought into the Perdue plant by Tufco. Thus, as with paint unintentionally sprayed on passing cars in *A-1 Sandblasting*, the styrene monomer resin is not a "pollutant" under the "pollution exclusion" clause in the CGL policy purchased by Tufco from West American.

## IV.

[4] The last reason the pollution exclusion does not deny coverage to Tufco for Perdue's claims is because the pollution exclusion applies only to discharges into the environment. Both the historical purpose underlying the pollution exclusion and operative policy terms indicate that a discharge into the environment is necessary for the clause to be applicable.

The historical purpose of the pollution exclusion limits the scope of the exclusion to environmental damage. When the pollution exclusion was first instituted in the early 1970's, it applied, by its own terms, only to discharges of pollutants "into or upon land, the atmosphere or any water course or body of water . . . ." *Waste Management of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 693-94, 340 S.E.2d 374, 379, *reh'g denied*, 316 N.C. 386, 346 S.E.2d 134 (1986). *See Grinnell Mutual Reinsurance Co. v. Wasmuth*, 432 N.W.2d 495, 498 (Minn. Ct. App. 1988); *Broadwell Realty Services, Inc. v. Fidelity & Casualty Co. of N.Y.*, 218 N.J. Super. 516, 521, 528 A.2d 76, 79 (1987). In *Waste Management*, the North Carolina Supreme Court recognized that, from the insurer's perspective, the practical reason for the pollution exclusion is to avoid "the yawning extent of potential liability arising from

the gradual or repeated discharge of hazardous substances *into the environment.*" 315 N.C. at 698, 340 S.E.2d at 381 (emphasis added). Indeed, insurance companies' attempts to expand the scope of the pollution exclusion so that it denies coverage for *non-environmental damage* have been rejected by the courts in other states. *See Grinnell,* (damages caused by insulation inside home not excluded by pollution); *A-1 Sandblasting,* (pollution exclusion did not exclude coverage for damage to passing cars resulting from overspray by bridge painters); *Pepper Industries, Inc. v. Home Ins. Co.,* 67 Cal. App. 3d 1012, 134 Cal. Rptr. 904 (1977) (damages caused by gasoline discharged into city sewer system are not excluded by pollution exclusion clause).

In 1985, the insurance industry amended the pollution exclusion clause in the standard commercial liability policy in order to clarify certain issues that had arisen regarding the interpretation of the provision. This new pollution exclusion clause is the one present in the policy before this Court. This new pollution exclusion clause is explained in a document made part of the record on appeal. This document is entitled International Risk Management Institute, Inc., Commercial Liability Insurance, Volume I, Section V, Annotated CGL Policy (1985) ("the I.R.M. Annotated CGL Policy"). According to the I.R.M. Annotated CGL Policy at V.E. 1-2, the amendment to the pollution exclusion was intended by the insurance industry to exclude governmental cleanup costs from coverage. Even though the new pollution exclusion does omit language requiring the discharge to be "into or upon land, the atmosphere or any water course or body of water," the I.R.M. Annotated CGL Policy gives no indication that the change in the language was meant to expand the scope of the clause to non-environmental damage. Accordingly, this Court agrees with the defendants and refuses to change the historical limitation that the pollution exclusion clause does not apply to non-environmental damage.

The operative policy terms of the pollution exclusion clause imply that there must be a discharge into the environment before coverage can be properly denied. The operative terms in the version of the pollution exclusion clause at issue in this case are "discharge," "dispersal," "release," and "escape." While they are not defined in the policy, the terms "discharge" and "release" are terms of art in environmental law and include "escape" by definition and "dispersal" by concept.

"Discharge" is defined in the federal regulations interpreting the Resource, Conservation and Recovery Act ("RCRA"), section 1004(3) as the "accidental or intentional spilling, leaking, pumping, pouring, emitting, emptying, or dumping of hazardous waste into or on any land or water." 40 C.F.R. § 260.10 (1990). "Release" is defined in § 101(22) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, *escaping*, leaching, dumping, or disposing *into the environment* . . . ." 42 U.S.C. § 9601(22) (1988) (emphasis added).

Because the operative policy terms "discharge," "dispersal," "release," and "escape" are environmental terms of art, the omission of the language "into or upon land, the atmosphere or any water course or body of water" in the new pollution exclusion clause is insignificant. The omission of the phrase only removes a redundancy in the language of the exclusion that was present in the earlier pollution exclusion clause. Consequently, we find that any "discharge, dispersal, release, or escape" of a pollutant must be into the environment in order to trigger the pollution exclusion clause and deny coverage to the insured. We also agree with the defendants that the discharge at issue here, confined to a cooler within a chicken processing plant, does not qualify.

In *Grinnell*, the Court of Appeals of Minnesota addressed the question of whether discharges not into the environment fell within the original version of the pollution·exclusion clause. The court stated that:

> Considering the nature and purpose of the pollution exclusion . . . [t]he ordinary reader of the exclusion would reasonably conclude that it would not limit coverage for respondents' unexpected damage due to installation of building materials in a home, but would exclude pervasive environmental pollution problems such as hazardous waste dumping. The policy contains a pollution exclusion, not a delayed-action injury exclusion or *an exclusion for all vapor cases* . . . [The insured] purchased insurance to protect himself from damage resulting from the installation of insulation. Under the broad coverage afforded, he would reasonably expect coverage.

*Grinnell*, 432 N.W.2d at 499 (emphasis added).

Likewise in the case at bar, Tufco purchased CGL insurance to protect itself from claims that might arise as a result of its

DOYLE v. SOUTHEASTERN GLASS LAMINATES

[104 N.C. App. 326 (1991)]

installation of industrial flooring. The policy contains a *pollution* exclusion, not an exclusion for all damages that may result due to Tufco's use of chemicals in the installation of industrial flooring. In light of the language of the West American policy and Tufco's reasonable belief that damages accidentally arising from its normal business activities would not be excluded, we agree that the pollution exclusion clause in the West American policy applies only to discharges into the environment and not to the non-environmental damage that led to Perdue's claim against Tufco.

CONCLUSION

Based upon the foregoing reasoning, we agree that the trial court properly granted the summary judgment of declaratory relief to the defendants Tufco and Perdue and properly denied the same to the plaintiff West American. The pollution exclusion clause contained in the CGL policy purchased by Tufco from West American does not deny coverage to Tufco for Perdue's claims in this case. Accordingly, the decision of the trial court is,

Affirmed.

Judges ARNOLD and JOHNSON concur.