## CLARENDON AMERICA INSURANCE COMPANY, Plaintiff,

v.

### BAY, INC., Defendant.

### Civil Action No. H–97–2234.

United States District Court,
S.D. Texas,
Houston Division.

June 1, 1998.

Glenn R. Legge, Lisa Liles, Legge, Farrow, Kimmitt and McGrath, Houston, TX, for Clarendon America Ins. Co.

G. Don Schauer, Schaur, Simank and Ledbetter, Corpus Christi, TX, for Bay Inc.

### MEMORANDUM AND ORDER

ATLAS, District Judge.

Plaintiff Clarendon America Insurance Company ("Plaintiff" or "Clarendon") has moved for summary judgment in this insurance coverage suit. *See* Plaintiff, Clarendon America Insurance Company's Motion for Summary Judgment [Doc. # 12] ("Motion"). Defendant Bay, Inc. ("Defendant" or "Bay") has responded in opposition. *See* Bay, Inc.'s Response, and Incorporated Brief in Support Thereof, to Plaintiff, Clarendon America Insurance Company's Motion for Summary Judgment [Doc. # 14] ("Response"). Having considered the Motion, Response, Reply, matters of record and the relevant authorities, the Court determines that the Motion should be **GRANTED IN PART** and **DENIED IN PART.**

### I. FACTUAL BACKGROUND

The underlying circumstances giving rise to Clarendon's declaratory judgment action are not disputed. Clarendon issued two insurance policies to Berry Contracting Inc. ("Berry"): Policy No. TCN0698/94/0023 (Exhibit A to Motion) ("Policy '23"), and Policy No. TCN0698/95/0053 (Exhibit B to Motion) ("Policy '53"). Policy '23 provided comprehensive general liability insurance, extending from March 31, 1995 until March 31, 1996. Policy '53 furnished commercial general liability for the period from March 31, 1996 through May 20, 1997. Bay is a wholly-owned subsidiary of Berry, and is listed as a named insured under both policies.

Two state lawsuits have been brought in Texas against Bay, styled *Librado Amador, et al. v. Alamo Concrete Products, Limited, et al.,* C.A. No. 16696 ("*Amador*") and *Javier Benavides, et al. v. Magic Valley Concrete, Inc., et al.,* C.A. No. 96–89 ("*Benavides*") (collectively, the "underlying litigation"), for personal injury and property damage allegedly sustained by numerous plaintiffs.

In *Amador,* the plaintiffs allege that the "[d]efendants are engaged in the production, transportation, and use of cement, additives, sand and gravel," which contain toxic ingredients. *See* Plaintiffs' Fourth Supplemental Petition (Exhibit G to Motion, filed with Reply) ("*Amador* Petition"), at 27. The *Amador* plaintiffs either reside near plants that process the ingredients to make concrete, or are exposed to cement and its ingredients at their workplaces. *See id.* at 28. They allege that "by contact with wet cement and by contact with the dust, sand, gravel, silica and other particulates produced by [d]efendants, [p]laintiffs have had toxic substances enter their lungs, skin and eyes, causing injury." *See id.* at 29. Specifically, the *Amador* plaintiffs maintain that they suffered injury through prolonged exposure of their skin to cement, allowing the substances to enter their bodies through the skin, eyes, and lungs. *See id.* at 28. Further, they allege that they breathe "the fumes emanating from cement and its additives and inhale the dust, sand, gravel, silica and other particulates produced by the Defendants and which contain silica." *Id.* at 29. Further, the plaintiffs claim they often have exposed different portions of their bodies to wet cement, and that exposure to these substances has caused injury to their respiratory systems, nervous systems, lungs, skin, and eyes, and also causes brain damage. *See id.* at 27–28, 29.

The *Amador* plaintiffs maintain that they came into contact with toxic and non-toxic substances as a result of the defendants' production, transportation, distribution, or sale of the dry cement, its raw materials, and its additives. *See id.* More toxic and non-toxic substances were released as a result of: the operation of vehicles off paved surfaces and onto areas where the dry cement had settled; the process of mixing the cement for use; the maintenance of stockpiles of aggregate, sand, and gravel without sprinkling them with enough water to prevent dispersal; non-use of permanent roads or portions of the facility paved with a cohesive hard surface; failure immediately to clean up spillage

of cement and fly ash; failure to cover open-bodied vehicles; and failure to take reasonable caution during loading to prevent dispersal of the sand, gravel, and aggregate. *See id.* at 29–30. The *Amador* plaintiffs have brought causes of action for negligence, products liability, strict products liability, gross negligence, and assault and battery. *See id.*

In *Benavides*, the plaintiffs also allege that the "[d]efendants are engaged in the production, transportation, distribution, selling and use of cement, cement additives, sand, gravel, concrete, tile and cement products," which contain toxic ingredients. Plaintiffs' Third Amended Petition (Exhibit J to Motion, filed with Reply) ("*Benavides* Petition"), at 28. According to the *Benavides* Petition, each plaintiff performed work with or was otherwise exposed to the defendants' products. *See id.* at 27. It appears that many, if not all, of the *Benavides* plaintiffs worked in the cement industry, purchased cement, or worked with cement while laying foundations, parking lots, sidewalks, and driveways for residential homes and/or private business. *See generally* Affidavits attached to *Benavides* Petition. They allege that they have been injured by breathing, inhaling, and coming into contact with substances produced by the defendants. Specifically, they claim that they "breathe the fumes emanating from cement, concrete, sand, gravel, tile and their additives and by products and inhale the dust, sand, gravel, concrete, cement, and other particulates produced [by] the [d]efendants and which contain silica." *Id.* Moreover, the *Benavides* plaintiffs "often expose different portions of their bodies to the wet cement and concrete." *Id.* They claim to have suffered injury because of "prolonged exposure of their skin to the cement and other substances. Their bodies are exposed to the substances, which enter [their] bodies through the skin, eyes, and lungs." *Id.* at 29. Because of exposure to these substances, the *Benavides* plaintiffs claim injuries to their respiratory systems, nervous systems, and also allege brain damage. *See id.* at 28.

The *Benavides* plaintiffs allege they inhaled and contacted the dangerous substances because of the defendants' transportation, use, or misuse of the cement and other substances. *See id.* at 29. Moreover,

the operation of vehicles off paved surfaces and onto areas where dry cement has settled is alleged to cause more particulates and toxic substances to enter the plaintiffs' eyes, lungs, and skin, infiltrating their clothes. *See id.* at 29–30. Finally, these plaintiffs allege that toxic and non-toxic substances are also released during the mixing and pouring of the cement and other products. *See id.* at 30. They brought causes of action under theories of negligence, products liability, strict products liability, and gross negligence. *See id.*

Plaintiff Clarendon filed this declaratory judgment suit in federal court on July 2, 1997, invoking this Court's diversity jurisdiction. *See* Plaintiff's Complaint for Declaratory Judgment [Doc. # 1]. Clarendon asks the Court to declare that it has no duty to defend Defendant Bay in the *Benavides* and *Amador* suits pursuant to Policy '23 and Policy '53, and also requests a declaration that neither of the policies provides coverage for any liability arising out of the *Benavides* and *Amador* suits. *See id.* at 9. Clarendon now moves for summary judgment, arguing that no material fact questions exist concerning whether the policies at issue provide for a duty to defend or liability coverage for Defendant Bay in the underlying litigation. Although Bay does not contest Clarendon's description of the underlying litigation or the authenticity of the policies, Bay vigorously disputes Clarendon's contention that its policies provide no liability coverage or duty to defend in the underlying litigation.

## II. *SUMMARY JUDGMENT STANDARD*

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc); *Bozé v. Branstetter,* 912 F.2d 801, 804 (5th Cir.1990). The facts are to be reviewed with all inferences drawn in

favor of the party opposing the motion. *See Bozé,* 912 F.2d at 804 (citing *Reid v. State Farm Mut. Auto. Ins. Co.,* 784 F.2d 577, 578 (5th Cir.1986)). However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy— that is, when both parties have submitted evidence of contradictory facts." *Laughlin v. Olszewski,* 102 F.3d 190, 193 (5th Cir. 1996).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. If the movant meets this initial burden, the burden shifts to the nonmovant to demonstrate with "significant probative evidence" that there is an issue of material fact so as to warrant a trial. *See Texas Manufactured Hous. Ass'n v. Nederland,* 101 F.3d 1095, 1099 (5th Cir. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997); *Taylor v. Principal Financial Group, Inc.,* 93 F.3d 155, 161 (5th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996); *Transamerica Ins. Co. v. Avenell,* 66 F.3d 715, 718–19 (5th Cir.1995); *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.1994).

The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. *See Douglass v. United Services Auto. Ass'n,* 65 F.3d 452, 459 (5th Cir.1995), *revised on other grounds,* 79 F.3d 1415 (5th Cir.1996) (en banc); *Little,* 37 F.3d at 1075. Dispute about a material fact is genuine only if evidence is such that reasonable jury could return a verdict for nonmoving party. *See Stafford v. True Temper Sports,* 123 F.3d 291, 294 (5th Cir.1997); *Hanks v. Transcontinental Gas Pipe Line Corp.,* 953 F.2d 996, 997 (5th Cir.1992). In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *See McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir.), *revised on other grounds upon denial of reh'g,* 70 F.3d 26 (5th Cir.1995); *Little,* 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *See Little,* 37 F.3d at 1075 (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548).

## III. DISCUSSION

Clarendon moves for summary judgment, arguing that the claims in the underlying litigation are excluded by multiple provisions in both policies. Bay counters that genuine issues of material fact exist regarding the applicability of these provisions to the facts in the underlying litigation.

### A. General Insurance Contract Construction Principles

■ In determining an insurer's duty to defend an insured against third-party claims, Texas applies the "eight corners rule," which dictates that Texas courts " 'look only to the pleadings and the insurance policy to determine whether the duty to defend exists.' " *Nautilus Ins. Co. v. Zamora,* 114 F.3d 536, 538 (5th Cir.1997) (quoting *Cullen/Frost Bank of Dallas, N.A. v. Commonwealth Lloyd's Ins. Co.,* 852 S.W.2d 252, 255 (Tex. App.—Dallas 1993), *writ denied per curiam,* 889 S.W.2d 266 (Tex.1994)); *National Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.,* 939 S.W.2d 139, 141 (Tex.1997). "If a petition does not allege facts within the scope of coverage, an insurer is not legally required to defend a suit against its insured." *American Physicians Ins. Exch. v. Garcia,* 876 S.W.2d 842, 848 (Tex.1994). Courts must liberally construe the allegations of the pleadings, and any doubt concerning coverage is resolved in favor of the insured. *See Nautilus,* 114 F.3d at 538; *Cullen/Frost,* 852 S.W.2d at 255. The duty to defend is determined by consulting the latest amended pleading upon which the insurer based its refusal to defend the action. *See Canutillo Indep. Sch. Dist. v. National Union Fire Ins. Co.,* 99 F.3d 695, 701 (5th Cir.1996) (citing *Rhodes v. Chicago Ins. Co.,* 719 F.2d 116, 120 (5th Cir.1983)).

■ "Texas courts do not look to conclusory assertions of a cause of action in determin-

ing a duty to defend. Instead, they look to see if the facts giving rise to the alleged actionable conduct, as stated within the eight corners of the [pleadings and policy] constitute a claim potentially within the insurance coverage." *Cornhill Ins. PLC v. Valsamis, Inc.*, 106 F.3d 80, 85 (5th Cir.1997) (citing *Adamo v. State Farm Lloyds Co.*, 853 S.W.2d 673 (Tex.App.—Houston [14th Dist.] 1993, writ denied)). When reviewing the underlying pleadings, the court must focus on the factual allegations indicating the origin of the damages, instead of the legal theories alleged. *See Merchants Fast Motor Lines, Inc.*, 939 S.W.2d at 141; *Adamo*, 853 S.W.2d at 676.

"[I]f the insurance contract is expressed in plain and unambiguous language, a court cannot resort to the various rules of construction." *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex.1987). Where an ambiguity exists, however, courts must give the petition the most liberal reading possible, resolving all legitimate doubts in favor of coverage. *See Lafarge Corp. v. Hartford Cas. Ins. Co.*, 61 F.3d 389, 394 (5th Cir.1995) (citations omitted). Interpretation of an insurance policy is a question of law. *See Data Specialties, Inc. v. Transcontinental Ins. Co.*, 125 F.3d 909, 911 (5th Cir.1997); *Guaranty Nat'l Ins. Co. v. North River Ins. Co.*, 909 F.2d 133, 135 (5th Cir.1990). The insurer bears the burden of showing that a policy limitation or exclusion constitutes an affirmative defense to or avoidance of coverage. *See* TEX. INS. CODE ANN. art. 21.58 (Vernon 1980); *Sentry Ins. v. R.J. Weber Co.*, 2 F.3d 554, 556 (5th Cir.1993). Policy exclusions are strictly construed against the insurer. *See Nautilus*, 114 F.3d at 538; *Ramsay v. Maryland Am. Gen. Ins. Co.*, 533 S.W.2d 344, 349 (Tex. 1976).

Upon construing a pollution exclusion similar to those at issue in the case at bar, the Texas Supreme Court explained the standards governing that inquiry:

Insurance policies are controlled by rules of interpretation and construction which are applicable to contracts generally. The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. Parol evidence is not admissible for the purpose of creating an ambiguity. If, however, the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation, and admit extraneous evidence to determine the true meaning of the instrument. An ambiguity in a contract may be said to be "patent" or "latent." A patent ambiguity is evident on the face of the contract. A latent ambiguity arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter. If a latent ambiguity arises from this application, parol evidence is admissible for the purpose of ascertaining the true intention of the parties as expressed in the agreement.

*See National Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995) (citations omitted).

The duties to defend and to indemnify are distinct and separate. *See Farmers Texas County Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 82 (Tex.1997); *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821–22 (Tex.1997). An insurer may initially have a duty to defend but, eventually, no duty to indemnify. *See Farmers Texas County Mut.*, 955 S.W.2d at 82. The reasons that negate a duty to defend, however, will likewise negate any possibility that the insurer will ever have a duty to indemnify. *See id.*

## B. *Pollution Exclusion Common to Both Policies*

■ Both policies contain the following Toxic Substances Exclusion, which states:

This insurance does not apply to any liability for bodily injury, personal injury, property damage and/or advertising injury directly or indirectly caused by or arising out of ... silica ... or any substances

containing such material or any derivative thereof.

Policy '23, Toxic Substances Exclusion, at tab 2 (attached with endorsements to policy); Policy '53, Toxic Substances Exclusion, at tab 4 (attached with endorsements to policy).

Clarendon insists that this exclusion categorically prohibits coverage under both policies. Clarendon maintains that silica is specifically mentioned. Moreover, Clarendon argues that the *Benavides* and *Amador* plaintiffs complain of injuries caused by exposure to silica itself and to other substances, *all* of which, according to Clarendon, contain silica. Consequently, Clarendon contends that the underlying claims are completely barred by the policies' Toxic Substances Exclusion.

According to Bay, however, under the wording and structure of the two underlying Petitions, it is unclear whether the words "containing silica" are intended to describe each of the inhaled substances, or only those substances generally identified as "other particulates." Bay further contends that, because Clarendon has not offered evidence as to the tort plaintiffs' intent in this regard, and because it cannot be determined at this stage of the proceedings whether they have correctly identified the content of all the allegedly inhaled substances, summary judgment excluding all claims from coverage should not be granted on this ground.

█ The Court concludes that to the extent the tort plaintiffs prove their injuries were caused by contact with silica, the claims are excluded by the Toxic Substances Exclusion. However, fact questions exist as to which injuries alleged by the tort plaintiffs were in fact caused by a substance containing silica.

The original *Amador* Petition states that the plaintiffs "inhale the dust, sand, gravel and other particulates [emanating] from the cement and its additives, which are produced, transported, manufactured, distributed or sold by the defendants and which contain silica." Exhibit D, at 31. The most recent *Amador* Petition reads: "Said items [produced by the defendants] contain toxic ingre-

dients. Some are natural to the product, and some are manufactured, transported, distributed or sold by the Defendants and which contain silica." *Amador* Petition, at 27. The second sentence appears in the *Amador* plaintiffs' general description of the substances produced by defendants to which they have been exposed.

Although the Petitions are not models of clarity, the Court determines that this allegation unambiguously asserts that at least some substances produced by the defendants, and contacted or inhaled by the plaintiffs, contained silica. It is factually unclear whether all of the alleged injuries were related in some way to silica.

In the Third Amended Petition, the *Benavides* plaintiffs claim that they "breathe the fumes emanating from cement, concrete, sand, gravel, tile and their additives and by products and inhale the dust, sand, gravel, concrete, cement, and other particulates produced [by] the Defendants and which contain silica." *See Benavides* Petition, at 28.[1] Thus, this claim clearly alleges that at least some, if not all, of the injuries alleged were caused by silica or substances containing silica.

Therefore, the Court grants summary judgment in favor of Plaintiff Clarendon as to all injuries to the *Amador* and *Benavides* plaintiffs caused by silica. Summary judgment is denied on this ground as to any injuries alleged that are not caused by silica. This Court cannot determine which substances that allegedly caused injury to plaintiffs in fact contain silica, and to this extent fact questions exist on which summary judgment cannot be granted at this time.

### C. *Pollution Exclusions under Policy '23*

#### 1. Total Pollution Exclusion

Clarendon also argues that the "Total Pollution Exclusion" in Policy '23 is dispositive on the issues of duty to defend and duty to provide coverage to Bay for the claims made in the underlying litigation. The Court de-

---

**1.** In the original *Benavides* petition, these plaintiffs alleged that they "breathe the fumes emanating from cement and its additives and inhale the dust, sand, gravel, silica and other particulates produced by the defendants and which contain silica." *See* Exhibit C to Motion, at 34.

termines that, while this exclusion does apply to many of the underlying claims at issue, there exists a latent ambiguity when this provision is applied to certain limited allegations in the underlying petition.

The Total Exclusion Endorsement in Policy '23 provides:

This insurance does not apply [to]:

f. (1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

\* \* \* \* \* \*

Pollutants means any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed.

Policy '23, Total Pollution Exclusion Endorsement, at tab 1 (attached with other endorsements to policy).

Clarendon argues that the Total Pollution Exclusion is unambiguous and clearly bars coverage for all claims asserted in the underlying litigation. Clarendon notes that the endorsement excludes coverage for bodily injury or property damage caused in some manner or to some degree by the release or escape of "*any* solid, liquid, gaseous, or thermal irritant or contaminant." According to Clarendon, since the *Amador* and *Benavides* plaintiffs claim in substantial part that their injuries were caused by the inhalation of dust, sand, and other substances containing silica, and fumes emanating from Bay's cement and its additives, and since these items are irritants and contaminants falling under the definition of "pollution," the Total Pollution Exclusion precludes coverage for the underlying claims.

 Bay maintains, however, that the terms "discharge," "dispersal," and "pollution" are terms of art, and that the sand, gravel, cement, and silica to which the *Benavides* and *Amador* plaintiffs were exposed do not constitute "pollutants." Consequently, Bay contends that these substances fall squarely within the scope of coverage in Policy '23, and summary judgment based on the

Total Pollution Exclusion is therefore inappropriate.

Parsing the language of, Total Pollution Exclusion in Policy '23 results in a mixed coverage result when applied to the multifaceted allegations by the plaintiffs in the two state suits. This Total Pollution Exclusion excludes coverage for " 'bodily injury' or 'property damage' which would not have occurred ... but for the discharge, dispersal, seepage, migration, release or escape of pollutants at any time.... Pollutants means *any* solid, liquid, [or] gaseous ... *irritant* or *contaminant* including smoke, vapor, soot, fumes, acid, alkalis, chemicals, and waste." *See* Policy '23, Total Pollution Exclusion Endorsement, at tab 1 (emphasis added). On its face, this exclusion presents no patent ambiguity. "[M]ost courts which have examined the same or substantially similar absolute pollution exclusions have concluded that they are clear and unambiguous." *CBI*, 907 S.W.2d at 521. As the court in *American States Ins. Co. v. Nethery*, 79 F.3d 473 (5th Cir.1996) observed:

"Pollutant" is a defined term in the policy. Whether the policy definition comports with this court's notion of the usual meaning of "pollutants" is not the issue; this court has no special expertise in writing insurance policies. Our judgment about the reasonable scope of a pollution exclusion—in the absence of ambiguity—must be tied to the language of the policy.

*Id.* at 475–76 (applying Mississippi contract interpretation doctrines).

Bay's term of art argument is unavailing. Bay has not cited, nor has research revealed, any state or federal cases construing these words as terms of art under. Texas law. To the contrary, the Fifth Circuit has taken a broader view of these exclusions, and has found they are not limited in application to traditional environmental pollution—releases that cause widespread environmental harm. *See Certain Underwriters at Lloyd's London v. C.A. Turner Constr. Co.*, 112 F.3d 184, 187 (5th Cir.1997) (discharge of phenol gas into tent held to constitute "pollution" for purposes of pollution exclusion, notwithstanding appellants' argument that incident was more in nature of simple workplace accident than

traditional environmental pollution); *Nethery*, 79 F.3d at 475–76 (under Mississippi law, pollution exclusion clause extended to paint and glue fumes as "irritants," even though they do not normally inflict injury).[2] Therefore, contrary to Bay's argument, Texas state and federal courts have not explicitly recognized the word "pollution" as a term of art.

Nor is Bay's argument that sand, gravel, cement, and silica are raw materials, by-products, or end-products that do not appear on Environmental Protection Agency lists dispositive. In fact, the *Nethery* court specifically noted that "numerous courts have found substances constituted pollutants regardless of their ordinary usefulness." *Nethery*, 79 F.3d at 477–78 (citing cases finding that carbon monoxide from hockey rink machine, dust escaping during packing operations, and passive cigarette smoke constituted pollutants).[3] Thus, silica is within the ambit of "pollution" as defined in this provision.

■ Likewise, the terms "discharge" and "dispersal," are not ambiguous and apply to many of the claims in the two state suits. The *Benavides* plaintiffs allege that they have suffered injuries "as a result of contacting and inhaling the toxic ingredients, dust, and particulates." *Benavides* Petition, at 29. Similarly, the *Amador* plaintiffs maintain that "[a]s they contact and inhale the dust, sand, gravel, and other particulates, [they] come into contact with substances that give rise to injury to their respiratory system, nervous system, and cause brain damage." *Amador* Petition, at 27. Thus, both sets of tort plaintiffs allege that they have suffered bodily injury and property damage from the

"discharge, dispersal, . . . migration, release or escape of pollutants," namely dust, sand, gravel, tile, concrete, cement, silica, fumes, and other particulates, which qualify as "solid [or] gaseous . . . irritant[s] or contaminant[s]." Policy '23, tab 1. The exclusion is thus applicable to the majority of tort claims in the *Amador* and *Benavides* Petitions.

■ The Court finds, however, that there is a latent ambiguity when the exclusion is applied to certain discrete claims asserted by both groups of plaintiffs in the underlying litigation. The *Amador* plaintiffs maintain that they "often expose different portions of their bodies to the wet cement," and "contact wet cement." *Amador* Petition, at 29. Likewise, the *Benavides* Plaintiffs allege that they "often expose different portions of their bodies to the wet cement and concrete." *Benavides* Petition, at 28. The Court is unable to ascertain definitively from these pleadings whether the bodily injury caused by such contact or exposure occurred when the plaintiffs' skin touched the wet cement and concrete while the cement and its ingredients were in the cement's intended container or location, in which case resulting injuries did not stem from the "discharge, dispersal, seepage, migration, release or escape of pollutants," Policy '23, tab 1.

Accordingly, the Court grants summary judgment in favor of Clarendon as to all claims of injury caused by the discharge, dispersal, seepage, migration, release, or escape of pollutants, but denies summary judgment for those injuries caused by direct contact with wet cement, in which instance the Court finds a latent ambiguity in the total

---

**2.** Likewise, Bay's reliance on *West Am. Ins. Co. v. Tufco Flooring East, Inc.*, 104 N.C.App. 312, 409 S.E.2d 692 (1991), even if it were binding on this court, is unpersuasive. In *Nethery*, the Fifth Circuit specifically rejected the insured's argument that the pollution exclusion did not apply to the use of "unadulterated" products in the insured's normal business operations, noting, most significantly, that the *Tufco* court "ruled the exclusion was expressly inapplicable to and overridden by the policy's supplemental 'products-completed operations hazard clause,' which did not cover the plaintiff's claim." *See Nethery*, 79 F.3d at 477–78. Moreover, as Plaintiff Clarendon notes, "[t]he Total Pollution Exclusion Endorsement at issue in Bay's policy . . . does not contain a requirement that the pollutants be brought on or

to the site or location as did the pollution exclusion interpreted by the *Tufco* court." Reply, at 4.

**3.** As the court in *American Home Assurance Co. v. Devcon Int'l, Inc.*, No. 92–6764–CIV, 1993 WL 401872, at *3 (S.D.Fla. Sept.28, 1993), noted, the Supreme Court has recognized silica dust as an industrial pollutant, *see Washington Metropolitan Area Transit Auth. v. Johnson*, 467 U.S. 925, 104 S.Ct. 2827, 81 L.Ed.2d 768 (1984 and regulations promulgated as part of the Occupational Safety and Health Act ("OSHA") by the Secretary of Labor characterize silica dust and other mineral dusts as "air contaminants" that must be regulated.) *See* 29 C.F.R. § 1910.1000.

pollution exclusion. *See Donahue v. Bowles, Troy, Donahue, Johnson, Inc.,* 949 S.W.2d 746, 753 (Tex.App.—Dallas 1997, writ denied) ("When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue.").

### D. *Pollution Exclusion Provisions under Policy '53*

#### 1. Seepage and Pollution Endorsement

The Seepage and Pollution Endorsement is separate and apart from other pollution exclusion provisions, and specifies that all other terms and conditions remain unchanged. The Seepage and Pollution Endorsement reads:

Such coverage as is afforded by this policy shall not apply to any claim arising out of the discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, alkalis, toxic chemicals, liquids or gases, waste materials, oil or other petroleum substance or derivative (including any oil refuse or oil mixed wastes) or other irritants, contaminants (including saline contamination) pollutants into or upon land, the atmosphere, or any watercourse or body of water.

This exclusion shall not apply, however, provided that the Insured establishes that all of the following conditions have been met:

(a) the occurrence was accidental and was neither expected nor intended by the Insured. An occurrence shall not be considered unintended or unexpected unless caused by some intervening event neither foreseeable nor intended by the Insured.

(b) the occurrence can be identified as commencing at a specific time and date during the term of this policy.

(c) the occurrence became known to the Insured within 72 hours after its commencement.

(d) the occurrence was reported in writing to these underwriters within 30 days after having become known to the Insured.

(e) the occurrence did not result from the Insured's intentional and wilful violation of any government statute, rule or regulation.

Nothing contained in this Endorsement shall operate to provide coverage with respect to:

(1) loss of, damage to or loss of use of property directly or indirectly resulting from subsidence caused by sub-surface operations of the Insured;

(2) removal of, loss or damage to subsurface oil, gas or any other substance;

(3) fines, penalties, punitive damages, exemplary damages, treble damages or any other damages resulting from multiplication of compensatory damages;

(4) any site or location used in whole or in part for the handling, processing, treatment, storage, disposal or dumping of any waste materials or substances or the transportation of any waste materials or substances;

(5) Blowout or cratering.

All other terms remain unchanged.

Policy '53, Seepage and Pollution Endorsement, at tab 1 (attached with endorsements to policy). Clarendon maintains that complete fulfillment of the first set of requirements in subparagraphs (a)-(e) under the exclusion—a "buy-back" clause—is a condition precedent to reinstating the insurance coverage excluded in the introductory paragraph of this provision. In particular, Clarendon argues that Defendant Bay failed to comply with the requirement in subparagraph (c), which requires that the occurrence become known to the insured within 72 hours after its commencement, and provision (d), providing that notice of the occurrence must be in writing to underwriters within 30 days after having become known to the insured.[4] Consequently, Clarendon contends that because Bay has failed to meet these conditions precedent to reinstatement of coverage, coverage for the losses alleged by the *Benavides* and *Amador* plaintiffs is excluded under this policy.

---

**4.** The Court notes that it appears that Bay also cannot satisfy the requirements of paragraph (b): that the occurrence can be identified as commencing at a specific time and date *during* the term of this policy. Since the parties have not briefed this issue, however, the Court will not reach it at this time.

### a. *The Policy Exclusion.*

This exclusion in Policy '53 bars coverage for the "discharge, dispersal, release or escape [of irritants or contaminants] into or upon land, the atmosphere, or any watercourse or body of water." The irritants and contaminants described are virtually identical to those described in the Policy '23 Absolute Pollution Exclusion. The Court therefore determines, as it did above, that the irritants described by the *Amador* and *Benavides* plaintiffs in the underlying litigation are contemplated by this exclusion insofar as they constitute "smoke, vapors, soot, fumes, toxic chemicals, liquids or gases, ... or other irritants [or] contaminants." Policy '53, tab 1. To the extent Bay argues that such substances are not "pollutants," its arguments are rejected for the reasons discussed, *supra.*

Bay also contends, however, that the underlying litigation alleges claims in addition to the discharge of pollution into the environment. Bay points to the *Benavides* and *Amador* plaintiffs' allegations that the tort defendants placed toxic substances into the cement mix, which caused injury when plaintiffs came into contact with those substances. Thus, according to Bay, the claimed injuries arise not only from the alleged contamination of air, but also by potential direct contact with the cement.[5]

The Court concurs with Bay on its reading of this aspect of the tort plaintiffs' claims. As discussed in connection with Policy '23's Total Pollution Exclusion, certain of the tort plaintiffs' claims allege direct contact with wet cement. Clarendon's argument that "[a]ll references to the alleged hazardous substances contacting the plaintiffs' skin and work clothes is made in conjunction with the discharge, dispersal, release or escape of such substances into or upon the land or atmosphere," Reply, at 8, is not supported by the record. The underlying plaintiffs' allegations of direct contact of their skin or clothing with wet cement would not constitute injury from the "discharge, dispersal, release or escape [of pollutants] ... *into or upon land, the atmosphere, or any watercourse or body of water.*" Policy '53, tab 1 (emphasis

added). Thus, although the Seepage and Pollution Endorsement applies to many of the tort claims, it cannot be found on this record to apply to those arising from contact with wet cement, and to that extent summary judgment is denied.

### b. *Buy–Back Provision*

As to those claims that appear to be excluded by the Policy '53's Seepage and Pollution Endorsement, the buy-back clause "serves ... to reinstate coverage that has been found to be excluded." *Certain Underwriters at Lloyd's London v. C.A. Turner Constr. Co.,* 941 F.Supp. 623, 629 (S.D.Tex. 1996), *aff'd,* 112 F.3d 184 (5th Cir.1997) (Hoyt, J.). This clause provides that five specific conditions must be met in order for coverage to be reinstated.

 *Amador Pleadings.*—The Court finds that Clarendon has demonstrated the absence of fact questions regarding paragraph (d), the requirement that the occurrence be reported to the underwriters within 30 days after becoming known to the Insured as to Librado Amador. According to summary judgment evidence submitted by Clarendon, the latest point at which Bay would have known of the alleged occurrences would have been August 9, 1996, when Hector P. Gonzalez, counsel for the *Amador* plaintiffs, notified Defendant Bay that he was representing Librado Amador "in his efforts to seek compensation for all the injuries he sustained as a result of being exposed to and inhaling toxic fumes from a product either manufactured, sold or distributed by you." Letter from H.P. Gonzalez to Bay Incorporated, dated Aug. 9, 1996 (Exhibit H to Motion, filed with Reply). Bay did not report these claims until September 23, 1996. *See* Exhibit I to Motion (filed with Reply). Assuming, without deciding, that reporting to the Swanter & Gordon Insurance Agency is sufficient to constitute notice in writing to the underwriters, the notice of Mr. Amador's claims in underlying the underlying suit was received more than thirty days after August 9, 1996. The Gonzalez letter mentions *only*

---

**5.** The decision in *Continental Casualty Co. v. Rapid American Corp.,* 80 N.Y.2d 640, 593 N.Y.S.2d 966, 609 N.E.2d 506 (1993), cited by Bay, is inapposite. There is no ambiguity in

most of the tort plaintiffs' allegations that their injuries were caused by the discharge of pollutants into the air.

Librado Amador, and not the additional plaintiffs involved in the *Amador* litigation. The Court therefore can only determine when Bay became aware of the occurrences that were the bases of Mr. Amador's claims, and cannot ascertain on this record when Bay became aware of the occurrences underlying the remaining *Amador* plaintiffs' claims.

Thus, there exist no fact issues regarding whether Defendant Bay complied with the notice requirement of the buy-back position as to Mr. Amador. Bay therefore has failed to satisfy at least one of the prerequisites of the buy-back provision as to him, and that provision thus cannot operate to reinstate coverage denied under the Seepage and Pollution endorsement. Fact questions exist on this aspect of the buy-back provision as to the remaining *Amador* plaintiffs.

***Benavides Pleadings.***—Construing all doubts in favor of Defendant Bay, the insured, the Court finds that fact issues exist as to when Bay was made aware of the alleged occurrences in the *Benavides* case. Although Clarendon assumes that Mr. Gonzalez provided notice of the *Benavides* suit in addition to the *Amador* suit, there is no evidence of when or if such notice occurred.

**6.** The Court simply cannot ascertain when Bay received notice. The Court notes, however, that it appears Bay cannot have fulfilled both prerequisites; they are mutually exclusive based on these facts. Since the *Benavides* plaintiffs state that their claims arose as early as 20 years prior to February 1997 and as recently as several years prior to February 1997, it is clear that Defendant Bay could not have both discovered the commencement of the occurrences within 72 hours and reported said occurrences within 30 days, as required by subsections (c) and (d). Bay did not report to the carrier until Sept. 25, 1996, which almost certainly would have been more than 30 days after Bay learned of the occurrences' commencement.

Likewise, the fact that Bay was not mentioned in the Affidavits attached to the Third Amended Petition is insufficient to conclude that Bay should not be a party to the *Benavides* litigation. Bay is still a named defendant in the petition, and as such, the allegations in the actual petition are made against Bay along with the other defendants.

**7.** As to Clarendon's other argument that Bay did not become aware of the occurrence within 72 hours of its (the occurrence's) commencement, the Court cannot grant summary judgment because Clarendon did not offer evidence clearly

Thus, as to the *Benavides* suit, because fact questions remain concerning when Defendant Bay became aware of the occurrences alleged in that suit, the Court cannot grant summary judgment based on subsections (c) and (d) of the buy-back provision at this juncture.[6]

In summary, as to the Seepage and Pollution Endorsement, the Court grants summary judgment as to the exclusion of claims made by Mr. Amador petition that allege injuries because of discharge, dispersal, release, or escape of pollutants into the atmosphere, but denies summary judgment for injuries allegedly caused by direct contact with the wet cement.[7] The Court denies summary judgment as to whether the Seepage and Pollution Endorsement acts to exclude coverage for the remaining *Amador* claims and the *Benavides* claims.[8]

## 2. Coverage A—Bodily Injury and Property Damage Liability

Clarendon also argues that Section 1.2.f under Coverage "A" of Policy '53, which sets forth coverage for Bodily Injury and Property Damage Liability and related exclusions, bars coverage for the *Amador* and *Benavides* claims. Section 1.2.f states:

> establishing when the occurrences commenced or when Bay became aware of the occurrences with the exception of Mr. Amador's claims.

**8.** In its discussion of the Seepage and Pollution Endorsement, Clarendon also attempts to bootstrap a more general argument that Bay has failed to establish that the claims of the *Amador* and *Benavides* plaintiffs would trigger either Policy '23 or '53. *See* Reply, at 11, 12. Because this argument was asserted in the Reply, Bay has not had an opportunity to respond to this argument. The time periods covered under the policies are clear: Policy '23 covers incidents occurring from March 31, 1995 to March 31, 1996, and Policy '53 covered the period from March 31, 1996 to May 20, 1997. While these policy terms are clear however, because of the numerous claims asserted in the underlying litigation by myriad plaintiffs, the Court cannot ascertain with specificity which discrete claims fall within the prescribed time periods, and which do not. At any rate, it is clear that some of the *Amador* and *Benavides* claims arose during those windows of time, and thus, Clarendon's argument that "Bay has also failed to establish that the claims of the plaintiffs in the underlying litigation would trigger either the '23 or '53 policy," is at least partially incorrect. Therefore, summary judgment is denied on this ground at this time.

## SECTION I—COVERAGES
## COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

\* \* \* \* \* \*

2. **Exclusions**

\* \* \* \* \* \*

f. (1) "Bodily Injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

(i) if the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or

(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

> Subparagraphs (a) and (d)(i) do not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire.

As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

Policy '53, Commercial General Liability Coverage Form, at 1–2.

Clarendon and Bay do not make any substantially new arguments regarding this exclusion. Instead, they rely on the same arguments asserted regarding the applicability of the Total Pollution Exclusion of Policy '23 and the Seepage and Pollution Endorsement of Policy '53.[9] For the reasons discussed above, the Court finds that the majority of the claims asserted by the *Amador* and *Benavides* plaintiffs fall under this exclusion, with the possible exception of potential injuries caused by direct contact of wet cement with the plaintiffs' skin or clothing, because in this context it does not appear at this time on this record that these latter injuries were caused by the "discharge, dispersal, seepage, migration, release or escape of pollutants." Policy '53, tab 2.

█ The Court finds in addition that the exclusion in Coverage A bars coverage for any injuries that were caused by the escape of pollutants at or from premises owned, occupied, rented, loaned, or used by Bay, or by the transportation or handling of wastes, at or from the premises where any contractors or subcontractors were working on Bay's behalf when the pollutants were brought on or to the work premises in connection with operations done on behalf of Bay.

Thus, any injuries that occurred outside of Bay's own premises or those of its contractors—such as those injuries that occurred as a result of tort plaintiffs' or their employers' purchasing Bay's cement and working with it *for their own purposes,* at their *own* busi-

---

9. Bay also argues that the Seepage and Pollution Endorsement operates to modify the Bodily Injury and Property Damage exclusions, rendering an examination of the Bodily Injury and Property Damage provisions unnecessary. Bay's support is a footnote in a Southern District of New York case, *American Home Prods. Corp. v. Liberty Mut. Ins. Co.,* 565 F.Supp. 1485, 1498 n. 2 (S.D.N.Y. 1983), *aff'd as modified,* 748 F.2d 760 (2d Cir. 1984). Even if this case were binding, its reasoning is not persuasive. The potential injuries considered in the Bodily Injury and Property Damage exclusion is merely a subset of all the potential claims contemplated in the Seepage and Pollution Endorsement. Moreover, as Plaintiff Clarendon argues, "[t]he language of the two provisions [is] quite different and [has] different prerequisites or requirements for the exclusion of substances and for the reinstatement of coverage under the Seepage and Pollution Endorsement." Reply, at 16.

nesses or work sites—are not barred from coverage by this clause.[10]

### 3. Auto Exclusion

■ Clarendon argues that Policy '53's "auto exclusion" also acts to preclude coverage for the underlying claims. This exclusion provides:

g. "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

\* \* \* \* \* \*

"Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment."

Policy '53, Commercial General Liability Coverage Form, at 2, 7.

Clarendon contends that the causes of action alleged by the *Benavides* and *Amador* plaintiffs clearly assert that the substances complained of were transported by vehicles into the property or adjacent property, triggering the auto exclusion in the policy. Bay argues for a strict construction of this exclusion, and maintains that Clarendon has not demonstrated that the *Amador* and *Benavides* plaintiffs would not have otherwise come into contact with the raw materials and cement mix if Bay had not hauled these substances into the area in question, and further has not demonstrated that nothing besides Bay's vehicles were capable of disturbing the dry settled cement located off the paved road surface to which the *Benavides* and *Amador* plaintiffs refer. Because Clarendon has not offered summary judgment evidence in this regard, Bay argues that coverage under the Auto Exclusion cannot be denied as a matter of law.

Defendant Bay relies on a Tennessee case, *Travelers Ins. Co. v. Aetna Casualty & Sur. Co.*, 491 S.W.2d 363 (Tenn.1973), to support its argument and offers no Texas authority on point. The *Travelers* case involved an injured plaintiff who was shot when the son of the insured was placing a shotgun inside the automobile through the rear window on the passenger's side, and the gun discharged for an unknown reason. The court found that use of the vehicle was not the "efficient and intervening cause" of the injury.

The Texas Supreme Court has emphasized the necessity of a causal connection between the injury and the use of the auto in order to qualify for this exclusion. *See National Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 142 (Tex.1997).

The Court concludes that some of tort plaintiffs' claims fall within the automobile exclusion. The plaintiffs repeatedly refer to the transportation of the raw materials and additives as being a cause of injury to them. The *Amador* plaintiffs allege: they have contacted the substances by the defendant's transportation of the cement, *see Amador* Petition, at 28; that they come into contact with toxic substances as a result of the transportation of the cement, its raw materials and additives, *see id.* at 29; operation of vehicles off paved surfaces caused more particulates and toxic substances to contact the plaintiffs, *see id.;* defendants permitted drivers to use non-permanent roads, resulting in the vehicles scattering toxic substances, *see id.* at 30; and defendants permitted or operated open-bodied vehicles to enter the facility without a cover, causing sand, gravel and aggregate to contact plaintiffs, *see id.* The *Benavides* plaintiffs alleged that they: made contact with defendants' products by defendants' transportation of the cement and other substances, *Benavides* Petition, at 29; and operation of the vehicles off paved surfaces, *see id.* at 29–30.

As Clarendon argues, it is clear from the pleadings that transportation had more than a tangential connection to many, though not all, of the underlying plaintiffs' injuries—it allegedly was one of the direct causes of the pollutants' transmission to plaintiffs. To the extent the plaintiffs' injuries were caused by the defendants' use of vehicles, the Court finds that the auto exclusion applies to exclude coverage and grants summary judgment in favor of Clarendon.

---

**10.** This ruling, of course, does not provide coverage if another exclusion has been held to apply.

## IV. CONCLUSION

For the reasons stated above, the Court determines that many, but not necessarily all, of the alleged injuries and claims in the underlying litigation are barred from defense or coverage by exclusions in Policies '23 and '53. Clarendon's Motion for Summary Judgment [Doc. # 12] is therefore granted in large part in accordance with this Memorandum and Order. It is therefore

**ORDERED** that Clarendon's Motion for Summary Judgment [Doc. # 12] is **GRANTED IN PART** and **DENIED IN PART**. It is further ordered and declared that:

A. Under the Toxic Substances Exclusion in Policies '23 and '53, defense and coverage is excluded for all alleged injuries caused by or related to silica, or substances containing silica.

B. Under the Total Pollution Exclusion in Policy '23, defense and coverage is excluded for all alleged injuries caused by the discharge, dispersal, seepage, migration, release, or escape of pollutants, except where such injuries were caused by direct contact with wet cement.

C. Under the Seepage and Pollution Endorsement in Policy '53, defense and coverage is excluded for all claims made by Mr. Amador alleging injuries caused by discharge, dispersal, release, or escape of pollutants into the atmosphere, excluding injuries allegedly caused by direct contact.

D. Under the Bodily Injury and Property Liability provisions in Policy '53, defense and coverage is excluded for any injuries caused by the escape of pollutants at or from premises owned, occupied, rented, loaned, or used by Bay, or from the premises where any contractors or subcontractors were working on Bay's behalf, or by the transportation or handling of waste.

E. Under the Auto Exclusion in Policy '53, defense and coverage is excluded for all alleged injuries caused by the use of vehicles in transporting the substances in question.

Fact questions exist as to defense and coverage for all other claims.